# EXHIBIT 1

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION**

| | |
|---|---|
| **EVAN RASKIN,** )<br>1321 Rhode Island Avenue NW )<br>Washington, DC 20005 )<br>Individually and on behalf of all )<br>others similarly situated, )<br> )<br>    Plaintiff, )<br> )<br>    v. )<br> )<br>**BUILD A SIGN LLC,** )<br> )<br>    Defendant. )<br> ) | **Case No.** 2026-CAB-003909 |

## CLASS ACTION COMPLAINT AND JURY DEMAND

### I. Introduction

1.     Plaintiff Evan Raskin ("Plaintiff"), individually and on behalf of all others similarly situated, brings this class action complaint against Build A Sign LLC ("Build A Sign" or "Defendant"), for violations of the District of Columbia Consumer Protection Procedures Act ("CPPA"), D.C. Code §§ 28-3901 to -3913, and alleges as follows.

2.     This case challenges a systematic, enterprise-wide deceptive advertising practice. Defendant operates at least eleven consumer-facing e-commerce websites—selling products ranging from custom canvas prints and yard signs to banners, license plates, shirts, and political campaign materials—under a unified corporate structure controlled from Austin, Texas. Every one of these websites employs the same fictitious reference pricing scheme: consumers are shown a prominently displayed "regular" price that has never been the prevailing market price and a struck-through visual treatment suggesting a price reduction. The purported discounts—ranging from

1

25% to 95% depending on the brand and the marketing channel in which the discount appears—are permanent, automatic, omnipresent, and universal. They have run continuously for years, and the advertised goods and services are never sold at the claimed "regular" prices quoted.

3.      In addition, these deceptive representations are encountered by consumers before any interaction with Defendant's Terms of Service ("Terms"), before any account creation, and before any purchase. When a consumer searches the internet for products and services of the type sold by Defendant, he or she encounters Defendant's false reference pricing in the search engine results themselves. Then, when the consumer clicks through to any of Defendant's websites, he or she encounters false reference pricing on the banners of the homepage, on the product pages, on the checkout page, and on every other page—all without login, account creation, or assent to any of Defendant's Terms. Defendant violates the CPPA each time a D.C. consumer views Defendant's ubiquitous fictitious discounts on its webpages, regardless of whether the consumer purchased Defendant's products and services; each time the consumer receives promotional emails from Defendant; and each time the consumer purchases any product or service displayed on Defendant's websites.

4.      The CPPA creates an "enforceable right to truthful information" from merchants about consumer goods and services. *District of Columbia v. Facebook, Inc.*, 340 A.3d 1, 4 (D.C. 2025). The statute "extends beyond literal falsehoods and includes any omissions, 'innuendo[s],' or 'ambiguit[ies]' that have a tendency to mislead reasonable consumers." *Id.* Defendant's systematic fictitious reference pricing scheme violates this right. Liability attaches "whether or not any consumer is in fact misled, deceived, or damaged thereby." D.C. Code § 28-3904. Additionally, no proof of intent is required. *Frankeny v. District Hosp. Partners, LP*, 225 A.3d 999, 1002 (D.C. 2020).

5.      Plaintiff brings this action on behalf of himself and District of Columbia consumers harmed by Defendant's fictitious reference pricing. Plaintiff seeks certification of an Exposure Damages Class and Purchaser Subclass of consumers identifiable through Defendant's ordinary-course records, and an Exposure Injunction Class of all District consumers shown the challenged pricing on Defendant's websites or in its marketing emails. Plaintiff seeks statutory damages of $1,500 per violation or treble damages (whichever is greater), attorney's fees, and injunctive relief prohibiting Defendant from continuing its deceptive practices in the District of Columbia.

## II. Parties

6.      Plaintiff Evan Raskin is an individual who currently resides in the District of Columbia and resided there when, on or about November 9, 2025, he visited Defendant's EasyCanvasPrints.com website from the District of Columbia. Plaintiff Raskin is an amateur painter who produces original artworks and orders canvas prints of those works. Prior to any interaction with Defendant's Terms of Service or checkout process, Plaintiff was exposed to Defendant's representations of discounts of up to 93% off purported "regular" prices on publicly accessible web pages, including search results, landing pages, and product pages. The website displayed a struck-through "regular" price of $363.54 alongside a "sale" price of $57.66 for a 36″×24″ canvas print, indicating that a discount had been applied. Plaintiff purchased the product for $57.66 (plus $7.45 in tax and $14.99 in shipping, for an order total of $80.10) in connection with his ongoing artistic practice. Plaintiff is not regularly engaged in the business of purchasing canvas prints for resale to the general public. Prior to and independently of his purchase, Plaintiff was deprived of truthful pricing information required by the CPPA.

7.      Plaintiff Raskin's ongoing artistic practice continues to generate works he may wish to have printed on canvas. He continues to receive Defendant's marketing emails containing the challenged fictitious reference prices and purported discounts. When he searches online for canvas-print services, he encounters Defendant's brand domains—including EasyCanvasPrints.com and CanvasOnTheCheap.com—among the providers presented in his search results. Because Defendant's represented "regular" prices and discounts are not truthful, Plaintiff cannot rely on Defendant's claimed savings when comparing Defendant's offerings against those of competing vendors.

8.      Defendant Build A Sign LLC is a Delaware limited liability company with its principal place of business at 11525A Stonehollow Dr., Suite 120, Austin, Texas 78758. Defendant may be served with process through its registered agent, Corporation Service Company, 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant operates at least eleven active consumer-facing e-commerce domains: AlliedShirts.com, BannersOnTheCheap.com, BuildASign.com, CanvasOnTheCheap.com, CrazyCheapPoliticalSigns.com, CustomRealEstateSigns.com, EasyCanvasPrints.com, FlagsOnTheCheap.com, MagnetsOnTheCheap.com, RetractableBannersOnTheCheap.com, and SignsOnTheCheap.com. An inventory of Defendant's known brands—all of which are marketed using the same violative practices—is set forth in Exhibit A. Defendant conducts business in the District of Columbia through its websites, which are accessible to and target consumers in the District of Columbia. Defendant ships products to District of Columbia addresses, and it derives revenue from transactions with District of Columbia consumers. Defendant is a "merchant" within the meaning of D.C. Code § 28-3901(a)(3), and its advertising and sale of consumer goods or services constitutes a "trade practice" under D.C. Code § 28-3901(a)(6).

4

9.      Defendant is a subsidiary of Cimpress plc (NASDAQ: CMPR), a publicly traded mass customization company. Cimpress acquired Build A Sign in October 2018. Cimpress describes the challenged operation as "BuildASign.com . . . and our many 'On The Cheap' brands."

### III. Jurisdiction and Venue

10.      This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 11-921(a), which grants the Superior Court original jurisdiction over all civil actions brought in the District of Columbia, and pursuant to D.C. Code § 28-3905(k)(1), which authorizes private actions for violations of the CPPA.

11.      Venue is proper in this Court pursuant to D.C. Code § 28-3905(k)(2), which provides that any claim under the CPPA "shall be brought in the Superior Court of the District of Columbia."

12.      The Court has personal jurisdiction over Defendant because Defendant purposefully directed its commercial activities at the District of Columbia: Defendant operates websites accessible to District consumers; advertises its products to District residents through online channels; solicits and accepts orders from District consumers; and ships products to District addresses. D.C. Code § 13-423(a)(1).

13.      Plaintiff seeks relief under D.C. Code § 28-3905(k)(2), which provides for treble damages or $1,500 per violation, whichever is greater, plus reasonable attorney's fees and injunctive relief.

### IV. Factual Allegations

**A. Defendant's Unified Cross-Brand Pricing Apparatus**

14.      Defendant operates a network of at least eleven consumer-facing e-commerce domains, all deploying the same fictitious reference pricing scheme. These domains share a

centralized infrastructure, technical systems, branding elements, and operational control. Upon information and belief, the pricing scheme is planned and/or coordinated from Defendant's Austin headquarters.

15.    **Shared Technical Infrastructure.** Defendant's brand domains share a centralized technical infrastructure that Build A Sign operates. The subsidiary brand domains run on Build A Sign's e-commerce platform and load product images and visual assets from a content delivery network that Build A Sign hosts and controls. The subsidiary domains share that platform's configuration, with the same or similar checkout-page templates and promotional banners. These shared technical elements demonstrate that the false discount pricing displays on Defendant's domains originate from a single platform-level configuration that Build A Sign hosts and controls.

16.    **Identical Promotional UI Pattern.** Every one of Defendant's domains displays a promotional banner across the top of its pages advertising a perpetual percentage discount—e.g., "25% Off Everything" (BuildASign.com), "55% OFF" (SignsOnTheCheap.com), "45% OFF" (BannersOnTheCheap.com), and "Up to 93% OFF" (EasyCanvasPrints.com). Similarly, the same pricing format is displayed on every domain's product pages: a struck-through "regular" price alongside a lower "sale" price, with the percentage "savings" prominently featured. The visual presentation is effectively identical across all eleven domains—the same banner placement, the same crossed-out reference price format, the same discount-percentage framing—all confirming that the fictitious reference pricing originates from a single centralized source.

17.    **Shared Operational Identity.** At least six of Defendant's domains use identical customer service language, referring to their support teams as "Customer Love Teams." The footer of SignsOnTheCheap.com explicitly lists eight of the 10 other brands as sister brands under the heading "Our Brands." Cimpress corporate job postings describe Defendant's operations as

6

"BuildASign.com . . . and our many 'On The Cheap' brands," confirming that the parent company views these domains as a unified portfolio of similar brands and not separate entities.

**B. The Discounts Are Permanent**

18.    Defendant's advertised discounts are permanent fixtures, not genuine promotional events. BuildASign.com, Defendant's flagship website, has advertised "25% OFF" on every product category continuously for at least six years. FlagsOnTheCheap.com has displayed "50% OFF TODAY!" in its HTML title tag continuously for more than six years. EasyCanvasPrints.com has displayed an "Up to 93% OFF" claim in its HTML title tag continuously since at least 2021. AlliedShirts.com has advertised discounts of between 30% and 50% for more than a decade. In each instance, the respective brand has never offered its goods and services at the claimed "regular" price.

19.    Defendant offers the same false discounts while it rotates seasonal labels to create the false impression of time-limited promotional events. Internet Archive captures of CrazyCheapPoliticalSigns.com show the identical 60% discount across years of snapshots— labeled "MARCH MADNESS SALE!" in the spring, "Summer Savings" in the summer, and "CYBER WEEK SALE!" in the winter. Internet Archive captures of EasyCanvasPrints.com show the same pattern: title-tag captures confirm an "Up to 93% OFF" claim embedded in page metadata visible to search engines and consumers, while consecutive monthly captures of homepage banners show a continuous series of purported "sales"—"Holiday Sale," "Spring Sale," "Black Friday Sale," "Valentine's Flash Sale"—with only the seasonal label changing. A discount that is always offered is not a discount—it is the regular price.

**C. The "Regular" Prices Are Fictitious**

20.    Plaintiff's pre-suit investigation has identified no evidence that Defendant has offered its products at the stated "regular" price on any Defendant-operated website in nearly a decade. Notably, Internet Archive captures of BuildASign.com from 2002 through approximately 2016 show that the site operated for more than 14 years without any sitewide discount banner or struck-through pricing—confirming that Defendant's current ubiquitous, cross-brand, perpetual-discount advertising scheme is a deliberate corporate marketing strategy adopted in or around 2016–2017.

21.    D.C. Code § 28-3901(d) mandates that courts construe the CPPA with "due consideration and weight" to Federal Trade Commission interpretations of comparable federal consumer protection statutes. The FTC's Guides Against Deceptive Pricing, 16 C.F.R. § 233.1 (2026), accordingly provide persuasive guidance on what constitutes a genuine "former price" versus a fictitious reference price.

22.    Defendant's "regular" prices are not "former prices" within the meaning of 16 C.F.R. § 233.1, which describes a bona fide former price as one at which "the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of [the advertiser's] business, honestly and in good faith—and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based." 16 C.F.R. § 233.1(b). The Guides further confirm that any displayed former price—whether or not accompanied by descriptive terminology such as "Regularly," "Usually," or "Formerly"—constitutes a former-price representation subject to the same standard. *Id.* § 233.1(e). Defendant's reference prices fail every element of the FTC's bona-fide-former-price standard:

(a) They were never "openly and actively offered for sale" at those prices;

8

(b) They were not offered "in the regular course of business" but exist only as struck-through reference points;

(c) They were established for the purpose of creating a fictitious higher price on which a deceptive comparison is based; and

(d) They were never offered for "a reasonably substantial period of time" as genuine transaction prices.

**D. Deceptive Email Marketing: False Urgency and Perpetual "Sales"**

23.     Defendant reinforces its fictitious pricing through its marketing emails. Its emails display the same struck-through "regular" prices and percentage-off discount claims as Defendant's websites, and it uses urgency language such as "Today Only," "Ends TONIGHT," and "FINAL Hours." It also rotates "extended" sale labels, even though the "discounted" pricing is always available.

## V. Pre-Assent Advertising

24.     The challenged pricing representations appear before any purchase and before any meaningful presentation of Defendant's Terms. Internet search results on search engines, such as Google, show Defendant's false discounts in the HTML title tags of the search results (e.g., "Canvas Prints—Photos to Canvas Prints | Up to 93% OFF"). Thus, even before clicking through to any of Defendant's websites, D.C. consumers are shown Defendant's untruthful and misleading pricing schemes. Upon arriving at any Defendant-operated website, consumers are immediately met with Defendant's sitewide promotional banners and product pricing with struck-through "regular" prices alongside lower "sale" prices. No login, account creation, or affirmative assent to any of Defendant's Terms is required to view these representations or for Defendant to violate the CPPA.

9

25.     Defendant's Terms of Service are not prominently displayed and they are referenced only at the checkout step—after the consumer has been exposed to the fictitious pricing and has formed the intent to purchase. The statutory violation alleged in this complaint—the publication of fictitious reference prices to D.C. consumers—is complete before the consumer reaches checkout. Representative screenshots documenting this sequence on EasyCanvasPrints.com and BuildASign.com are attached as Exhibit B.

### VI. Defendant's Terms of Service

26.     To the extent Defendant contends that any of its online Terms govern Plaintiff's claims, Plaintiff disagrees. Defendant's deceptive pricing representations are made—and the CPPA violation occurs—before the Terms are displayed. The representations are displayed in search results and on publicly accessible web pages—before any possible consumer interaction with Defendant's Terms.

27.     Furthermore, even when a consumer purchases a product from one of Defendant's websites, Defendant does not obtain clear, affirmative assent to its Terms. Across its checkout pages, Defendant purports to capture consumer assent by means of a single boilerplate sentence— "By clicking Secure Checkout below you agree that you have read and understand our Terms of Sale" (or, on two brands, "our Terms and Conditions"). There is no checkbox, scroll box, pop-up, or other mechanism requiring affirmative acknowledgment or assent. The consumer merely purchases the product or service. In addition, on eight of eleven brand domains, the words "Terms of Sale" in the checkout text are not even hyperlinked. Even the claimed contractual trigger described in Defendant's own Terms—clicking a "PLACE ORDER NOW" button—does not exist on any of Defendant's eleven domains. The button is instead labeled "Secure Checkout."

10

28.     In Plaintiff's November 9, 2025 transaction on EasyCanvasPrints.com, the only notice of Defendant's purported terms appeared as a small-print boilerplate sentence at the bottom of the checkout page stating that "By clicking Secure Checkout you agree to our Terms and Conditions," with the words "Terms and Conditions" rendered as a hyperlink to a separate page. The checkout did not include a checkbox, scroll requirement, separate acknowledgment screen, or any other mechanism requiring affirmative manifestation of assent to those terms apart from completing the purchase itself.

29.     Whether an agreement to arbitrate was formed, and whether arbitrability has been delegated, are questions for this Court to decide, absent clear and unmistakable evidence to the contrary. *Masurovsky v. Green*, 687 A.2d 198, 204 (D.C. 1996); D.C. Code § 16-4406(b). Plaintiff denies that any purported arbitration provision bars this action and reserves all rights to contest formation, scope, unconscionability, and delegation if Defendant moves to compel arbitration.

### VII. Class Action Allegations

30.     Plaintiff brings this action pursuant to Super. Ct. Civ. R. 23(b)(2), 23(b)(3), 23(c)(4), and 23(c)(5), on behalf of the following Classes and Subclass:

**Exposure Damages Class:** All natural persons who, while physically located in the District of Columbia during the three years preceding the filing of this Complaint, were shown—on a website identified in Exhibit A or in a marketing email sent by a brand identified in Exhibit A—a higher stated reference price (including a stated "regular," "original," "list," or "was" price) or a stated percentage- or dollar-off discount and who, as reflected in Defendant's ordinary-course records linked to identifiable customer, subscriber, account, cart, or contact information, either: (a) opened or clicked a marketing email containing such pricing; (b) visited a product, product-configuration, cart, or checkout page displaying such pricing; (c) added a product to cart, configured a product, or initiated checkout in connection with such pricing; or (d) submitted contact or account information in connection with such pricing.

**Purchaser Subclass:** All members of the Exposure Damages Class who, while physically located in the District of Columbia during the same period, completed a purchase from a website identified in Exhibit A after being shown—on a product, cart, or checkout page—

11

a higher stated reference price (including a stated "regular," "original," "list," or "was" price) or a stated percentage- or dollar-off discount in connection with that purchase.

**Exposure Injunction Class:** All natural persons who, while physically located in the District of Columbia during the same period, were shown—on a website identified in Exhibit A or in a marketing email sent by a brand identified in Exhibit A—a higher stated reference price (including a stated "regular," "original," "list," or "was" price) or a stated percentage- or dollar-off discount. The Exposure Injunction Class is pleaded under Rule 23(b)(2) for declaratory and injunctive relief only.

Excluded from the foregoing Classes are: (i) Defendant and its officers, directors, employees, agents, subsidiaries, and affiliates; (ii) Cimpress plc and its officers, directors, employees, and agents; (iii) any judicial officer to whom this case is assigned and members of that officer's immediate family; and (iv) any person who timely and properly excludes himself or herself from any damages Class or who has previously executed a release of claims against Defendant arising from the conduct alleged in this Complaint.

31.     Upon information and belief, Defendant maintains centralized ordinary-course records sufficient to identify members of the Exposure Damages Class and Purchaser Subclass through objective criteria. Those records include customer-account records, cart and checkout records, order histories, subscriber and marketing-email records, email open and click data, product-configuration and session records associated with identifiable customer or contact information, billing and shipping address records, and related account and contact data. Plaintiff expects class-member identification and claims administration for the damages Classes to be based primarily on those records rather than on individualized memory testimony. To the extent Defendant contends that the precise wording of the class definitions should be refined to conform to the structure of its records, Plaintiff requests leave to refine the class definitions consistent with Rule 23 after discovery into Defendant's data systems.

32.     Plaintiff reserves the right to amend the class definitions. The Exposure Damages Class, Purchaser Subclass, and Exposure Injunction Class are referred to collectively as the "Classes."

33.     **Concrete Injuries to Exposure Damages Class Members.** Defendant's fictitious reference pricing causes concrete injuries to members of the Exposure Damages Class regardless of whether they ultimately complete a purchase. The statutory violation at D.C. Code § 28-3904 is itself complete at the moment of publication, "whether or not any consumer is in fact misled, deceived, or damaged thereby." Separately, when District consumers are shown a struck-through "regular" price or represented discount and then open Defendant's pricing emails, click through product pages, configure products, add items to a cart, begin checkout, or submit contact information in connection with that pricing, they expend time and attention evaluating whether Defendant's represented bargain is genuine and comparing Defendant's represented prices against available alternatives. Those search, inquiry, comparison, and verification burdens are concrete injuries because Defendant's pricing scheme forces consumers to spend additional time searching for full and truthful pricing information and to make shopping decisions without being able to rely on Defendant's represented former prices as genuine. *See Hettinger v. Bozzuto Mgmt. Co.*, 2025 WL 2029747, at \*12 (D.D.C. July 21, 2025); *Rector v. Walmart Inc.*, 2025 WL 671211, at \*5 (D.D.C. Mar. 3, 2025).

34.     Plaintiff alleges both (a) a completed statutory violation under the CPPA upon publication of fictitious reference pricing to District consumers and (b) separate concrete injuries—including the search, comparison, inquiry, verification, and decision-making harms described above—sufficient to support standing. Plaintiff does not rely on a bare statutory violation, divorced from concrete adverse effects, as the basis for standing.

35.     **Numerosity (Rule 23(a)(1)).** The proposed Classes are so numerous that joinder of all members is impracticable. Defendant operates eleven consumer-facing brand domains selling custom signs, banners, apparel, and other products directly to purchasers nationwide.

Publicly available web analytics data indicates that Defendant's websites collectively receive more than one million visits per month from U.S. consumers. Given the volume of Defendant's nationwide e-commerce operations, the number of District of Columbia consumers who, during the three-year class period, opened or clicked Defendant's marketing emails, configured or carted Defendant's products while signed into accounts or in connection with identifiable contact information, or otherwise engaged the transaction funnel as recorded in Defendant's ordinary-course systems likely numbers in the thousands. The number of District of Columbia purchasers across Defendant's portfolio over that same period likewise likely numbers in the thousands. The broader Exposure Injunction Class is larger still. The precise numbers are unknown to Plaintiff but ascertainable from Defendant's business records, marketing-platform records, website analytics, and shipping databases.

36.    **Commonality (Rule 23(a)(2)).** The following questions of law and fact are common to one or more of the Classes, and many are common across all of them:

(a) Whether Defendant's stated "regular" prices are bona fide former or prevailing prices, or instead fictitious reference prices;

(b) Whether Defendant's stated discounts are genuine, time-limited promotional reductions or instead permanent features of Defendant's pricing architecture;

(c) Whether Defendant's pricing representations constitute misrepresentations of material fact under D.C. Code § 28-3904(e);

(d) Whether Defendant's visual pricing apparatus creates misleading innuendos or ambiguities under D.C. Code § 28-3904(f-1);

(e) Whether Defendant's representations concerning price reductions are false or misleading under D.C. Code § 28-3904(j);

14

(f)  Whether Defendant's Terms of Service, if enforceable at all, govern claims arising from exposure to the challenged fictitious reference-pricing representations before any meaningful presentation of those Terms;

(g)  Whether D.C. Code § 28-3905(k)(2)(A) permits statutory or treble damages on a classwide basis for members of the Exposure Damages Class and Purchaser Subclass; and

(h)  Whether Defendant's common course of conduct warrants classwide declaratory or injunctive relief for the Exposure Injunction Class.

37.     **Typicality (Rule 23(a)(3)).** Plaintiff's claims are typical of the claims of the Exposure Damages Class, Purchaser Subclass, and Exposure Injunction Class. Plaintiff encountered Defendant's fictitious reference pricing in a transaction-related setting—visiting product pages, configuring a canvas print, reviewing checkout pricing, and completing a purchase—and continues to receive Defendant's marketing emails displaying the same challenged pricing scheme. Plaintiff's claims arise from the same centrally managed course of conduct, challenge the same uniform pricing architecture, and depend on the same legal theories—material misrepresentation, misleading innuendo or ambiguity, and false price-reduction representations under D.C. Code § 28-3904(e), (f-1), and (j)—that will govern the claims of absent Class members. To the extent remedies differ across the Classes, those differences do not alter the typical nature of Plaintiff's challenge to Defendant's common pricing practices. Plaintiff's continuing exposure to Defendant's deceptive pricing through Defendant's marketing emails and ongoing operation of its brand websites also aligns his interests with those of absent Exposure Injunction Class members as to forward-looking relief.

38.    **Adequacy (Rule 23(a)(4)).** Plaintiff will fairly and adequately protect the interests of each of the Classes. Plaintiff's interests are aligned with those of absent class members in establishing that Defendant used a centrally managed fictitious reference-pricing scheme that violated the CPPA across its consumer-facing domains and marketing-email channels. Plaintiff's continuing exposure to Defendant's fictitious reference-pricing practices—through ongoing marketing emails and continued consideration of future purchases—also aligns his interests with those of absent Exposure Damages Class and Exposure Injunction Class members as to proving the same deceptive course of conduct and obtaining appropriate classwide relief. As a purchaser, Plaintiff is likewise aligned with absent Purchaser Subclass members in seeking monetary relief arising from purchases made in connection with the same challenged pricing scheme. Plaintiff has no interests antagonistic to or in conflict with any member of any Class. Plaintiff has retained counsel experienced in consumer-protection class action litigation who are committed to vigorously prosecuting this action on behalf of all Classes.

39.    **Predominance (Rule 23(b)(3)).** Questions common to the Exposure Damages Class and Purchaser Subclass predominate over any questions affecting only individual members. Defendant's challenged pricing conduct is centrally designed, uniformly deployed, and susceptible to common proof, including Defendant's archived webpages, title-tag history, product-page templates, cart and checkout interfaces, marketing-email templates, pricing algorithms, and common corporate control across its brand portfolio. The principal liability questions—whether Defendant's displayed "regular" prices are fictitious, whether its represented discounts are genuine, and whether those practices violate D.C. Code § 28-3904(e), (f-1), or (j)—can be answered with common evidence. Because the Exposure Damages Class and Purchaser Subclass are limited to consumers identifiable through Defendant's ordinary-course records and tied to

16

specified, recorded engagement or purchase events, individualized questions of class-member identification, injury proof, or damages administration do not overwhelm those common liability issues. To the extent the Court later determines that any particular category of individualized issues warrants separate treatment, Plaintiff alternatively seeks certification of common issues under Rule 23(c)(4) and certification of classwide forward-looking relief under Rule 23(b)(2).

40.    **Superiority (Rule 23(b)(3)).** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The claims of members of the Exposure Damages Class and Purchaser Subclass arise from the same centrally managed fictitious reference-pricing system, deployed across Defendant's consumer-facing domains and marketing-email channels, and turn on common evidence concerning Defendant's pricing architecture and marketing practices. The injury to individual Class members, while cognizable under the CPPA, is unlikely to justify the cost of separate individual actions, particularly where Defendant's ordinary-course records provide an administrable basis for identifying class members and evaluating their claims. Class treatment therefore promotes efficiency, avoids duplicative litigation over the same common course of conduct, and provides a realistic means for District consumers to vindicate their statutory rights. To the extent any narrower remedial or case-management issues later require separate treatment, those issues can be addressed through the alternative Rule 23(c)(4) and Rule 23(b)(2) mechanisms pleaded herein.

41.    **Certification of the Exposure Injunction Class (Rule 23(b)(2)).** Plaintiff seeks certification of the Exposure Injunction Class under Super. Ct. Civ. R. 23(b)(2) for declaratory and injunctive relief only. Defendant has acted on grounds generally applicable to the Exposure Injunction Class by deploying the same centralized fictitious reference-pricing system across its eleven consumer-facing domains and across its marketing-email channels. Plaintiff faces a real

17

and immediate threat of repeated exposure to that conduct. He remains in the market for canvas prints and related custom-printed products as part of his ongoing artistic practice. He continues to receive Defendant's marketing emails displaying the challenged pricing claims, and when he searches online for canvas-print services he encounters Defendant's brand domains among the available providers. Because Defendant's represented former prices and discounts are not truthful, Plaintiff cannot evaluate Defendant's offerings on a like-for-like basis when comparing canvas-print services—a present harm that will recur each time Plaintiff encounters Defendant's pricing representations. A single injunction requiring Defendant to cease publishing fictitious reference prices and false urgency claims on its websites and in its marketing emails would provide relief to each member of the Exposure Injunction Class on classwide terms.

42.    **Issues-Class Certification in the Alternative (Rule 23(c)(4)).** In the alternative, and to the extent the Court concludes that a full Rule 23(b)(3) damages class should not be certified, Plaintiff seeks certification under Rule 23(c)(4) of an issue class encompassing reasonably and workably segregable common issues the resolution of which would materially advance the litigation. Those issues are: (a) whether Defendant's centrally managed use of struck-through "regular" prices and stated percentage- or dollar-off discounts on its websites and in its marketing emails conveys to reasonable consumers that they are receiving genuine reductions from bona fide former or prevailing prices; (b) whether those representations are false or misleading under D.C. Code § 28-3904(e), (f-1), or (j); and (c) whether Defendant's common course of conduct warrants classwide declaratory or injunctive relief. These issues are susceptible to common proof and predominate within the certified component because they turn on Defendant's uniform pricing architecture, common templates, common marketing practices, and common corporate control. The proposed issue class itself satisfies Rule 23(a) and is maintainable under

18

Rule 23(b)(3), because common questions predominate within the certified issues and resolution of those issues would materially advance the fair and efficient adjudication of the litigation. Resolving these issues would leave only individualized questions of class-membership verification and damages administration, which can be addressed in subsequent proceedings without relitigating the common liability questions. *See Harris v. Med. Transp. Mgmt. Inc.*, 77 F.4th 746, 757–61 (D.C. Cir. 2023).

## VIII. Causes of Action

### Count I
### Violation of D.C. Code § 28-3904(e)
### (Misrepresentation of Material Fact)

43.     Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

44.     D.C. Code § 28-3904(e) makes it an unlawful trade practice to "[m]isrepresent as to a material fact which has a tendency to mislead."

45.     Defendant represents that its "regular" prices are bona fide former or prevailing prices at which its products or services were genuinely offered in the regular course of business. Defendant conveys this representation through the visual design of its pricing display: the "regular" price appears in a struck-through font in close proximity to the "sale" price, often accompanied by a discount percentage. This visual structure signifies to reasonable consumers that the struck-through price is a genuine former or prevailing price and that the lower price reflects a temporary reduction from that price.

46.     These representations are false. Defendant's "regular" prices are not and have never been bona fide former or prevailing prices for its products or services. Plaintiff's pre-suit investigation has identified no evidence of any bona fide sale at the stated "regular" price on any Defendant-operated website. A reasonable person "would attach importance to [the] existence or

19

nonexistence" of a genuine higher price "in determining his or her choice of action in the transaction." *Frankeny*, 225 A.3d at 1005. Defendant's misrepresentations are material because the difference between a genuine former price and a fictitious reference price is precisely the kind of information that would influence a reasonable consumer's purchasing decision.

47.    Plaintiff and the proposed Classes seek all relief authorized by D.C. Code § 28-3905(k), as applicable to each Class and as set forth in the Prayer for Relief.

## Count II
### Violation of D.C. Code § 28-3904(f-1)
### (Innuendo or Ambiguity Tending to Mislead)

48.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

49.    D.C. Code § 28-3904(f-1) makes it an unlawful trade practice to "[u]se innuendo or ambiguity as to a material fact, which has a tendency to mislead." Defendant uses a coordinated system of visual and textual elements to convey that consumers are receiving genuine bargains from genuine "regular" prices, whether or not each individual element is framed as a stand-alone express factual assertion. The elements of this system include:

(a) Displaying "regular" prices in struck-through font in close proximity to "sale" prices, a visual convention that signifies a price reduction from a genuine former price;

(b) Calculating and displaying discount percentages (e.g., "25% OFF," "Save 60%," "93% OFF"), which convey that the consumer is paying a fraction of what the consumer would otherwise pay; and

(c) Applying seasonal labels to permanent discounts ("Holiday Sale," "Spring Sale," "Black Friday Sale"), which convey that the discount is tied to a specific calendar event and will expire when the event ends.

50. While each element of Defendant's pricing apparatus is facially accurate in isolation—a numerical difference between "regular" and "sale" figures, a mathematically correct percentage, a label corresponding to a season or holiday—the overall impression is misleading because consumers are led to believe they are receiving a genuine, time-limited discount from a genuine market price when in fact the discount is permanent and the "regular" price is fictitious. That is innuendo within the meaning of D.C. Code § 28-3904(f-1). See *Ctr. for Inquiry, Inc. v. Walmart, Inc.*, 283 A.3d 109, 120 (D.C. 2022) ("product placement and associated signage can be actionable representations or innuendo" under the CPPA); *Earth Island Inst. v. Coca-Cola Co.*, 321 A.3d 654, 671–72 (D.C. 2024) (a "mosaic" of statements on a website can form a misleading claim actionable under §§ 28-3904(e)–(f)). The innuendo is material because a reasonable consumer would attach importance to whether a purported time-limited bargain is genuine.

51. Plaintiff and the proposed Classes seek all relief authorized by D.C. Code § 28-3905(k), as applicable to each Class and as set forth in the Prayer for Relief.

### Count III
### Violation of D.C. Code § 28-3904(j)
### (False Representations Concerning Price Reductions)

52. Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

53. D.C. Code § 28-3904(j) makes it an unlawful trade practice to "[m]ake false or misleading representations of fact concerning the reasons for, existence of, or amounts of price reductions, or the price in comparison to price of competitors or one's own price at a past or future time." Defendant's representations are false and misleading because:

(a) The existence of the price reductions is false. The "price reductions" are not reductions at all—they are permanent features of Defendant's pricing architecture.

Products are never offered at the stated "regular" prices. The "discounted" price is the only price.

(b) The dollar amounts and percentage figures presented as the "amounts" of price reductions are false because they are calculated from fictitious reference prices rather than genuine former or prevailing prices.

(c) The "reasons for" the purported price reductions—seasonal sales, holiday promotions, limited-time offers—are false. The discounts are not tied to inventory clearance, seasonal demand patterns, or marketing calendar events. They are permanent features relabeled with seasonal wrappers.

54.    D.C. Code § 28-3904(j) contains no express materiality requirement. Defendant's representations are actionable under that subsection because they falsely describe the existence, amounts, and reasons for price reductions. Moreover, even if the Court were to require a showing of materiality under subsection (j), Defendant's misrepresentations are material because a reasonable consumer would attach importance to whether a purported price reduction is genuine.

55.    Plaintiff and the proposed Classes seek all relief authorized by D.C. Code § 28-3905(k), as applicable to each Class and as set forth in the Prayer for Relief.

### IX. Declaratory and Injunctive Relief

56.    In addition to damages, Plaintiff seeks declaratory and injunctive relief that would redress the ongoing inability of Plaintiff and Class members to rely on Defendant's pricing representations when evaluating Defendant's goods and services in the District of Columbia. Plaintiff seeks a declaratory judgment that Defendant's ongoing use of fictitious reference prices, false urgency claims, and false price-reduction representations across its consumer-facing domains and marketing-email channels directed to District consumers, as alleged herein, violates D.C. Code

§ 28-3904(e), (f-1), and (j). Plaintiff further seeks injunctive relief prohibiting Defendant from continuing those practices. Such declaratory and injunctive relief would also benefit District consumers more broadly by ensuring that Defendant's representations conform to D.C. law going forward.

57.    Plaintiff seeks an injunction prohibiting Defendant from:

(a) Displaying any "regular," "original," "list," or "compare at" price on any website unless that price was the actual prevailing price at which the product was openly and actively offered for sale to consumers in the regular course of business for a reasonably substantial period of time, as defined by 16 C.F.R. § 233.1(b);

(b) Advertising or representing that any product is being offered at a "discount," "sale," "reduced price," or "special price" unless the discount is genuine—i.e., the product was previously offered at a higher price for a reasonably substantial period and the current price represents a bona fide reduction;

(c) Using terms such as "Sale," "Limited Time Offer," "Today Only," "Ends Tonight," or similar urgency language to describe any discount that is continuously or routinely available such that the claimed urgency is false or misleading;

(d) Displaying any struck-through prices, discount percentages, or promotional notifications unless the underlying pricing representation is consistent with 16 C.F.R. § 233.1 and the CPPA; and

(e) Engaging in any other deceptive trade practice prohibited by D.C. Code § 28-3904.

58.    This injunctive relief must apply across Defendant's consumer-facing domains and marketing-email channels directed to District consumers, including but not limited to the eleven domains identified in Exhibit A and any additional consumer-facing websites operated by

23

Defendant and displayed to District consumers, whether currently in operation or launched in the future.

59.     To the extent Defendant construes its arbitration clause or class action waiver to bar Plaintiff from seeking declaratory or injunctive relief in any forum, that application is unenforceable. The CPPA's express authorization of enforcement actions by individual consumers, nonprofit organizations, and public interest groups—D.C. Code § 28-3905(k)(1)(B)–(D)—reflects a legislative determination that consumer-protection enforcement serves the public interest. Defendant's own Terms expressly carve out equitable and injunctive relief from arbitration when sought by Defendant. The same forum must be available to Plaintiff and the putative Class members.

### X. Prayer for Relief

WHEREFORE, Plaintiff, individually and on behalf of the proposed Classes, respectfully prays for judgment as follows:

    a.  Certify the Exposure Damages Class, Purchaser Subclass, and Exposure Injunction Class, and alternatively certify an issue class as appropriate, pursuant to Super. Ct. Civ. R. 23(b)(2), 23(b)(3), 23(c)(4), and 23(c)(5), appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

    b.  Enter judgment in favor of Plaintiff and the Classes, as appropriate to the claims and remedies applicable to each, and against Defendant Build A Sign LLC on all counts;

    c.  Enter classwide declaratory relief as set forth in Section IX above, declaring that Defendant's ongoing fictitious reference-pricing practices violate D.C. Code § 28-3904(e), (f-1), and (j);

d.  Enter classwide injunctive relief as set forth in Section IX above, permanently restraining Defendant from engaging in fictitious reference-pricing practices in the District of Columbia across its consumer-facing websites and marketing-email channels directed to District consumers;

e.  Award Plaintiff, the Exposure Damages Class, and the Purchaser Subclass treble damages or $1,500 per violation, whichever is greater, pursuant to D.C. Code § 28-3905(k)(2)(A), with the precise method of counting violations to be determined consistent with the evidence and the Court's certification and merits rulings, provided that no Class member may obtain duplicative recovery for the same injury-producing conduct;

f.  Award reasonable attorney's fees pursuant to D.C. Code § 28-3905(k)(2)(B), and costs as permitted by law;

g.  Award restitution or other appropriate monetary relief on behalf of the damages Classes pursuant to D.C. Code § 28-3905(k)(2)(E);

h.  Award pre-judgment and post-judgment interest as permitted by law; and

i.  Grant such other and further relief as this Court deems just and proper.

### XI. Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: June 5, 2026

Respectfully submitted,

25

/s/ Andrew Levetown
Andrew Levetown (D.C. Bar No. 422714)
Levetown Law PLLC
1439 Woodhurst Blvd.
McLean, VA 22102
(703) 618-2264
Andrew@LevetownLaw.com


Gilbert W. Mears (D.C. Bar No. 90042775)
Law Office of G.W. Mears LLC
4328 Farragut St., No. 1007
Hyattsville, MD 20781
(240) 630-2738
Gilbert@GWMearsLaw.com


Counsel for Plaintiff and the Proposed Classes

26

## EXHIBIT A
### Domain Portfolio and Discount Claims

Defendant Build A Sign LLC operates eleven active consumer-facing e-commerce domains from a single entity. Each displays perpetual percentage-off discount claims in its HTML title tags.

| # | Domain | Perpetual Discount Claim |
|---|--------|--------------------------|
| 1 | AlliedShirts.com | 40–50% OFF (perpetual since 2018) |
| 2 | BannersOnTheCheap.com | 25–45% OFF (perpetual since 2017) |
| 3 | BuildASign.com | 25% OFF + FREE Shipping (perpetual since 2020) |
| 4 | CanvasOnTheCheap.com | Up to 87–91% OFF (perpetual since 2019) |
| 5 | CrazyCheapPoliticalSigns.com | 60% OFF (perpetual since 2020) |
| 6 | CustomRealEstateSigns.com | 40% OFF (perpetual since 2022) |
| 7 | EasyCanvasPrints.com | Up to 93% OFF (perpetual since 2021) |
| 8 | FlagsOnTheCheap.com | 50% OFF TODAY! (perpetual since 2020) |
| 9 | MagnetsOnTheCheap.com | 50% OFF (predominantly perpetual since 2018) |
| 10 | RetractableBannersOnTheCheap.com | 45–50% OFF (perpetual since 2021) |
| 11 | SignsOnTheCheap.com | 40–55% OFF (perpetual since 2019) |

Source: Internet Archive Wayback Machine verified title-tag extractions.

27

## EXHIBIT B
**Consumer Journey Screenshots:**
**EasyCanvasPrints.com and BuildASign.com**

The following screenshots document the consumer experience on two of Defendant's brand websites, from initial Google search results through checkout. Each stage displays Defendant's fictitious reference pricing. Authenticated captures with cryptographic hash verification and trusted timestamping are maintained separately as evidentiary originals.

**EasyCanvasPrints.com—Step 1: Search Results**

*Google search for "custom canvas prints" from Washington, D.C.*



Note: The "Up to 95% Off Canvas Prints" discount claim appears in the EasyCanvasPrints.com search result title tag before the consumer visits the site. The "95%" figure appears in the Sponsored (paid) listing; the organic listings for EasyCanvasPrints.com continue to feature "Up to 93% OFF" in their title tags, consistent with the discount claim cited throughout this Complaint.

29

**EasyCanvasPrints.com—Step 2: Homepage**

*EasyCanvasPrints.com homepage as displayed to a first-time visitor*



Note: The homepage displays an "Up to 95% Off Canvas Prints" promotional banner and a pricing table listing canvas sizes from 8×8 through 30×40, each showing a crossed-out "regular" price alongside a dramatically lower "sale" price. No login or account creation is required.

30

**EasyCanvasPrints.com—Step 3: Product Configuration**

*Canvas size selection page showing fictitious reference pricing for all available sizes*



Note: The product configuration page displays every canvas size with a crossed-out "regular" price alongside a lower "sale" price. For example, the 8×8 canvas shows $3.71 versus a struck-through $74.37 (labeled "95% OFF"); the 16×20 shows $16.99 versus $158.08 (89% OFF). The bottom bar repeats the fictitious reference price comparison.

31

**EasyCanvasPrints.com—Step 4: Checkout**

*Secure Checkout page with order summary displaying fictitious savings*



Note: The checkout page displays an "Order Summary" that reinforces the fictitious reference pricing: "Original Total" of $74.37, "You Saved ($70.66)," and a "Cart Total" of $3.71.

**<u>EasyCanvasPrints.com—Step 5: Terms of Service</u>**

*Bottom of checkout page showing browsewrap Terms and Conditions link*



Note: The checkout page presents a "Secure Checkout" button with small-print text: "By clicking Secure Checkout you agree to our Terms and Conditions." There is no checkbox, no scroll-through requirement, and no separate acknowledgment screen.

**<u>BuildASign.com—Step 1: Search Results</u>**

*Google search for "build a sign" from Washington, D.C.*



Note: BuildASign.com appears as a sponsored (paid) search result. The listing promotes "Up to 25% OFF + FREE Shipping" before the consumer visits the site.

34

**BuildASign.com—Step 2: Homepage**

*BuildASign.com homepage as displayed to a first-time visitor*



Note: The homepage displays a banner that reads, "Get 25% OFF + FREE Shipping."

**BuildASign.com—Step 3: Product Page**

*A representative product page showing crossed-out "regular" price alongside "sale" price*



Note: The product page displays a fictitious "regular" price alongside a lower "sale" price. The 18″×24″ Real Estate Panel is listed at $20.13 with a struck-through $26.84, showing "Save $6.71."

**BuildASign.com—Step 4: Checkout**

*Secure Checkout page with order summary displaying fictitious savings*



Note: The checkout page displays an "Order Summary" reinforcing the fictitious reference pricing: "Original Total" of $26.84, "You Saved ($6.71)," and a "Cart Total" of $20.13.

**<u>BuildASign.com—Step 5: Terms of Service</u>**

*Bottom of checkout page showing browsewrap Terms of Sale link*



Note: The checkout page presents a "Secure Checkout" button with small-print text: "By clicking 'Secure Checkout' below you agree that you have read and understand our Terms of Sale." There is no checkbox, no scroll-through requirement, and no separate acknowledgment screen.